Ladies and gentlemen, 08-3143, people be Edward Mitchell. All right, we can just have the appellant stand up, and then the appellees can identify themselves when their case is called. Everyone knows 15 minutes for each side, and then you can save any portion of that for rebuttal. We don't strictly hold you to those 15 minutes, certainly if the case is interesting. And this may apply here. Thank you very much, Your Honors. Good morning. My name is Stephen Becker of Becker Stevenson on behalf of the appellant, Edward Mitchell. As a result of the first two appeals in this case, this court reversed Mr. Mitchell's conviction and remanded for a new trial based on the fact that his statement had been physically coerced by Area 2 police detectives. Unfortunately, the retrial in this matter was fraught with forensic fallacies and foundational failings. Therefore, I wish to address today and focus on the fingerprint evidence and the forensic DNA. First issue I'd like to address is issue number one in our brief, the Safford issue. All right, but let's not call it a Safford issue quite yet until we get a few preliminary matters out of the way. And one is, what did the fingerprint evidence in this case tell the jury? Did it tell the jury that the defendant fired the weapon? No, not in this case. That's correct. Did it tell the jury that he was present at the location where the gun presumably was fired from the basis of the recovery of shells? No, it did not. And then we have the defendant who testified. Yes. Go on. OK. In this case, the prosecution used the fingerprint evidence to link Mr. Mitchell to the inoperable car that was in the garage at which the gun was fired. Let's make it a little broader than that. Let's say the fingerprint evidence connected him to the barn. True? True. That was the allegation. What else connected Mr. I'm sorry, the name? Mitchell. Mr. Mitchell to the barn? Nothing other than his own testimony where he said that he had been there before because his friend lived at that location. So he admitted being there. And once you're there, it may be a matter of ordinary events that might lead you to leave fingerprints in the location where the fingerprints are discovered. But there was no testimony or evidence shown by Mr. Mitchell's testimony that he ever went in the inoperable car, nor that he ever was by ammunition boxes. What if he couldn't remember? Well, there's no evidence to that effect. Does that exclude that evidence? Or does that make the evidence less significant? Or does that somehow impact the qualifications of the expert that actually testified? No, I don't think it impacts it at all, because this is a question of admissibility, of foundational problems that limit cross-examination. But we're also talking about the impact the fingerprint evidence had on the entire case, on proving this individual guilty beyond a reasonable doubt. And once we have his testimony say, yes, I was in that barn. And yes, I may have touched things there. I mean, maybe he didn't even have to say that, because he was in the barn. And I don't think it's contested that the barn itself was sort of like a, I can't think of a better word, clubhouse for the gang. And he admitted to be part of that gang. And he was in that clubhouse. And the fingerprints themselves were not discovered on the 40 mm bullets, which everyone agrees caused the death of the young girl, right? Right, the fingerprint was found on another box of .32 ammo. That's correct. And that had really nothing to do with the charges. That's correct. But the prosecution in closing argument did argue to the jury that because the print was found on the glass plate that was sitting in the inoperable car in which the weapon was found, that he must have been connected to the crime. And isn't that what lawyers do? They take a little bit of evidence, and then they argue it to the jury in their support. And that's what lawyers do. So I'm not sure your point is that the lawyers should never have argued that. I think the evidence, I mean, I think the lawyers were fair in taking that evidence and arguing it. The question is whether, I think, whether the fingerprint evidence really was as instrumental in the jury's verdict of guilty as you contend it is. And why do you think it really is? I think it is because the prosecution clearly used it. They introduced this evidence. But it's not a matter of use, is it? It's a matter of whether that evidence should have come in in the first place. OK, let's deal with that. And that's my point here. Obviously, the prosecution could argue what it wants with respect to the evidence. Why do you think it shouldn't have been admitted? I think it should not have been admitted because there was no information given by Ms. Seamer, very similar to Examiner Kutrow and Safford. Are you sure about that? Because I thought she testified that there were five points of comparison that she found. And she said they were easily found. And she tried to demonstrate that with her charts. She actually did not, Your Honor. That's what makes this case, I think, very interesting. Let me ask you this. When you say she did not, not with respect to her analysis, doesn't that mean that it's a matter of cross-examination? If she didn't, and then the jury can see that she didn't, and the jury can disregard her testimony, which goes back to the original question, whether her testimony was that critical to begin with. The question is whether it was admissible in the first place. And that is our argument. But inadmissible evidence does not necessarily lead to a reversal of a trial. That's correct. I think what Justice Garcia is getting at, that possibly this is harmless error. So what is your argument as to that? Yeah, my argument that this is not harmless error because the, well, in addition to the other arguments I will make, this was cumulative error. But clearly here, the prosecution used this. As this court said in Safford, forensic evidence, fingerprint evidence, very subjective in nature, has a very persuasive effect upon a jury. But you will concede that she did say that there were five points of comparison. And to the extent that she had a chart, she was available to be cross-examined on those five points. And there may have been as many as 13, but she didn't identify 13. Safford, I think, and I'm sure you read it well and maybe more than once, can't it reasonably be read as a case where no points of comparison were brought to light? And if it's a zero case versus a five case, and I think in Safford we pointed out that the Supreme Court said four to five points of comparison is good enough. And don't we have five points here? Well, here we have 13 points, Your Honor. The point is, though, that the chart that was used, and the state does not mention this in their brief, but this is critical to this particular case. During her regular testimony about her opinion, her opinion and her original examination took place all the way back in August of 1999. This chart. Let me interrupt you for one minute. Yes. The five points that she testified to, she did show the methodology in how she did that, did she? She did not. And she did not show that her method is normally used in the scientific community of fingerprint evidence, did she? She did not. She didn't use ACE-B system, did she? She did not. And isn't the ACE-B system the system that's used by most state's attorneys, certainly used by the federal government in every single case? That's correct, Your Honor. Yes. Isn't that what your argument is? Yes, you're right. Taking all that argument as established, where does that argument lead us? Does it lead us to a FRI hearing, which I think where Justice Gordon was leading? Or does it lead us to question whether she should have been admitted as an expert at all? And I understand that there was an objection made. But you don't raise that as an issue before us, whether or not she was qualified to testify as an expert, given that she was an expert. Well, she worked in fingerprints from 95 to 2000. And I forget when the retrial was. Retrial was 2008, if I'm not mistaken. 2008. Why should she have been allowed to testify, given that she had lost connection for eight years to the very specialized field of fingerprint analysis? Why should she have been allowed to testify? Isn't this case something like trying to set a minimum qualification for experts to come before a jury, to come as prior fact and to come as very persuasive witnesses, that they should have a minimum qualification, such as familiarity with the ACV? I didn't even know what that was, even though I was involved in this effort. I don't recall that ever coming up before. But if that's the minimum standard, and that's what the FBI uses, and that's what is critical for every well undisputed expert standard, then why shouldn't that have been a minimum requirement here, and why shouldn't that have been the issue before the trial judge, and why shouldn't that be the issue before us? Because I don't buy the Friar hearing argument, but I certainly question whether she should have been allowed to testify at all. But that's why we raised the Safford issue, is this is not a five point case. That's my whole point here. The testimony that she gave at trial, regarding her original analysis. When she says it's five points, she's then subject to cross-examination, and the defense counsel has to demonstrate that there are no five points. And then the defense counsel has to file a motion, or move to strike her testimony. And I'm not sure any of that happened. But Your Honor, what I'm saying is, in her analysis and the testimony, and at the time that she did the fingerprint analysis in 1999, she gave no testimony regarding her analysis, her methodology, or any number of points. That's why this makes it exactly like Examiner Coutreau and Safford. The demonstration that she gave, after she gave her testimony, was from a court chart made in August of 2008, nine years after she analyzed these fingerprints. And this was only for demonstrative purposes. And then she said, when I looked at this particular picture versus this, in August of 2008, I found 13 points, and I have marked five of them for you. That is not reasonable scientific certainty. It gives the defense no chance to cross-examine on the analysis that Ms. Seamer did back in August of 1999. That falls directly within Safford. Well, doesn't it also fall right into People versus McGowan, which is the Illinois Supreme Court case of 2010, where they say the burden is on the state to prove that the expert's methodology was generally accepted in the scientific community? Exactly right. It never happened in this case, did it? No, it did not, before I get into the fire. Let's get into that. OK. Let's get into McGowan. Sure. McGowan, of course, concerns the HDN test. Correct. Correct. And that, I think everyone acknowledged, was a relatively new development to determine whether an individual was driving under the influence. Fingerprints, as I think Judge Sachs pointed out, or maybe she pointed out, the expert, that they've been around for 100 years. And everybody's been using them. And I wasn't sure what your argument really is as to Fry. Are you saying that this particular methodology that she didn't testify to is subject to a Fry test? Or fingerprints in general, because they've never been really tested. They've simply been accepted over the long time that they've been used as legitimate scientific evidence, has never been tested. My argument here is that the methodology in this case is clearly this fries out for Fry. And the question becomes, is Fry meant to address a particular expert's methodology in otherwise generally accepted scientific technology? I don't think that it is. McGowan certainly doesn't stand for that, does it? McGowan stands for the proposition that when you look at Fry, it's, of course, general acceptance within the relevant scientific community. Answer me that question. Are fingerprints accepted under that very test? That has not been determined in Illinois to this point. That's why I'm making the issue here. So you are raising that. Let me ask you this. It's not the question of fingerprints. It's the question of the method that is used to determine the fingerprints. That's correct, exactly. Anybody could say anything about fingerprints, but they have to show how they did it. And here, she didn't show how she did it, did she? She did not, Your Honor. And you asked for a Fry hearing in your motion in limine. And it was denied. That's correct. And you never had one. That's correct. And she never testified to the method. That's correct. Howdy doody could have testified to fingerprints. That's right, Your Honor. But aren't fingerprints and the method inextricably tied so that you can't separate fingerprints? Nobody talks about fingerprints as if fingerprints are an identification tool without acknowledging that the methodology must be behind that fingerprint analysis. And so they're the same thing. I don't understand why you think that you can challenge, unless you're talking about challenging the very idea of using fingerprints. No, I'm challenging the methodology used by Ms. Seamer in this case, which was not the ACEV method, which is the established method. But that's not a Fry issue. Yes, it is, Your Honor. My point is that it's not a Fry issue. Why not? That is a qualifications of this expert issue. No, this is a methodology issue, Your Honor. That is what Fry is designed to look at, at the methodology issue. Are you saying that the Illinois State Police, that their lab analysis for fingerprints is totally subject to questioning because they apparently let their experts rely on any methodology that they learned under and apply that, whether they identify it or not, apply that methodology in giving their testimony? Is that what you're saying? No, Your Honor. I'm arguing that Ms. Seamer's methodology here was clearly flawed. She did work for the Illinois State Police. She did. But that does not make her methodology infallible. And clearly here, she did not follow the accepted method. She admitted the ACEV method has been around since 1959. So where in Fry do you get a question raised, not as to the general acceptability of this methodology, but as to whether or not an individual expert has properly used the one methodology that you believe should have been used? Fry is used whenever a defendant requires it. Why would we need a Fry test to begin with? We could simply say that she's not qualified if the ACEV is the gold standard. If that's the gold standard and she doesn't follow it, then she should have been excluded as an expert. Well, the court can find that if they want. But this is a question. Why go through a Fry test? Why go through a Fry hearing? Because McCown says that we have a right to do that because we do not have general acceptance. There's never been a Fry hearing in Illinois. But you're saying you don't have general acceptance to a methodology that's never been disclosed. That's what your argument is, that she doesn't have a methodology and therefore doesn't qualify to it. Her methodology, she said, I took visual observations and I used a magnifier. That's what fingerprint experts do. Well, a lot of fingerprint experts follow the ACEV method and Ms. Seamer did not. Even in the ACEV method, you have to look at the fingerprints. You have to, you can probably use a magnifying glass. I mean, those are unavoidable steps in the analysis of fingerprints, aren't they? Of course, you have to observe the fingerprints and look at them in detail. The question is here though, in Illinois, as McCown clearly said. Okay. You can now continue. Okay, as McCown clearly said, because there's no Fry hearing, this court looks then to see whether there are unequivocal cases from other jurisdictions or in literature. Clearly, the only two cases we found in Fry jurisdictions were State versus Rose, where the court found that this type of methodology did not meet the Fry standard and found that there had been numerous cases of misattribution over the years. And of course, looking at the internationally embarrassing case of Brandon Mayfield, where the FBI claimed that an attorney in Oregon was responsible for the Madrid bombings at the Atocha Station in Spain. And that was the ACEV method. Right, and we recognize in this effort that there's a very subjective component Precisely. In fingerprint analysis. And so this is the reason why a Fry hearing is required here, because this meets all the standards. And we're looking at this particular case, not challenging fingerprints in general, but the methodology in this case. The state's only argument here is that they claim a Fry hearing is unnecessary because where you have visual observations that are unconnected with the mechanical step, they say we should rely on the case of People versus Jennings which of course predated Fry by a decade and was a 1911 case. They also rely on Malone and Colombo, so cases from the 1970s. Well, we've read the briefs. Maybe you should go into the impeachment issue. Okay. All right. Would you like to hear on the impeachment of Mr. Jones? Well, the fact that you're claiming that you didn't have the opportunity to put in the prior inconsistent statements of the witness. Okay, sure. Yeah, that had to do with. It does concern Mr. Jones, but we know what the trial judge said as to that point. Trial judge says, everything came in already. Now you're trying to put the impeachment in a different manner, but the very points that you're seeking to raise have already been addressed in the transcript that was read to the jury. Why isn't that the case? Well, because the new defense counsel, some of these issues were not brought out in the same manner in the first trial. And so. Is it the same manner or is it the points? Well, some of the points and some of the same manner, but the fact is. What points were never raised at the first trial in the cross-examination of Mr. Jones? He felt that the defense attorney said that the same emphasis was not used on the points in the first trial. And so. Sounds like fertile ground for argument, not for additional cross-examination. And that's what you're asking for. You're asking for additional cross-examination. And really you're saying, we want to put these questions out before the jury because you can't get an answer to these questions. You just want to put them out before the jury. Sounds to me like that is closing argument sort of material and not something that you can introduce by way of impeachment. Your Honor, there's the old principle of what's good for goose is good for the gander. And here the prosecution was allowed to put on the testimony of the unavailable witness without any cross-examination. So isn't the defense attorney. But there was cross-examination. If you're in the trial, but yes. And it's that very same direct examination that was introduced. It was introduced from the earlier trial. So to that extent, both of you have to rely on what occurred in the earlier trial. And the question is whether what you're trying to, what your motion sought, the defendant's motion sought to introduce, whether that really could have turned the verdict. I don't know if that. I don't know if that could have been a reasonable probability of turning the verdict. I don't know if that itself would have turned the verdict, but in light of all the errors in this case, I think that it definitely could have had an impact because that was a star witness in the case. And if he claimed he was looking at his mother jogging for 300 feet to the home, as opposed to looking at who was the shooter, it could have had a difference in connection with the other issues in the case. And that wasn't brought out of the other trial. That's right, that's right. Make that clear, it wasn't brought out of the other trial. That's correct, that's correct. So I'd like to move on into the DNA issue, if I might. The first issue here had to do with the lack of adequate foundation, where Mr. Johnson, who was the DNA expert, only tested four of the loci of the eight available loci that were present. And so I am arguing that, I think this is an even stronger case than Safford, because in Safford, of course, that's a fingerprint case where you don't have a number of points of comparison. And yet, here, where we do have a standard, which is 13 loci from the FBI. Well, let's try to at least come to an understanding of what we're talking about here. We're talking about 13 being the number for an identification. That's correct. Was there an identification in this case by that DNA expert? No, there was a non-exclusion. And so... So why are you pointing at 13 as some sort of critical number in this case when that number didn't make any difference? Well, it does make a difference because every loci that is not tested is a possibility of excluding the defendant. That's why this is so critical in a DNA case as opposed to a fingerprint case. And so here there were eight testable loci. So in other words, if he would have tested number five, six, seven, or eight, any of those... He didn't have an expert testify that said there was no match. Wasn't there a DNA expert that testified? There was an expert that said that he was not excluded. That's correct. Oh, no, I thought there was a second DNA expert that said that he was not... No, that was regarding the co-defendant. Oh, the co-defendant. Yes, that wasn't regarding Mr. Mitchell. All right. And so here, why I think this is so critical is to me, this is essentially a evidentiary deception because it allows the DNA expert for the state to test only a certain amount of loci and say, well, see, the defendant is not excluded. But if they would have continued to test the additional loci, he could have been excluded. Or he could have been identified. We don't know. He could have. But the question is whether that evidence should have been introduced in the manner in which it was introduced. Correct. And whether or not there's a reason to have prohibited it. And what's your reason for having prohibited it? My reason for prohibiting it is it's not an adequate foundation because he had to test to get a conclusion. The rule you're advocating is that before any DNA evidence is introduced, all 13 loci, if that's how to pronounce it, had to be tested. Is that the rule? Right. Or in this case, eight because five had been decomposed. So he only could have tested eight. But otherwise, what it allows the prosecution to do is they could just go and test one loci and tell the jury, see, the defendant is not excluded. So he could be the perpetrator. And this, of course- And the defense argument is that he's not excluded, but neither am I. Neither are all of you. Neither is everyone else in the world other than the perpetrator. But the question is, is that admissible for purposes of an evidentiary foundation? What determines admissibility? The, and I'm going back to Safford, here you have- Well, is that the test here or is it just a matter of relevance? Well, it's a matter of prejudice and relevance, but it's also a matter of- Well, determining admissibility is a matter of relevance. And then once you've determined whether it's relevant- Is it more prejudicial- You can exclude it. Right, that's correct. But my additional argument here is based on your language in Safford that when the numbers start to go down towards zero, that affects admissibility and not weight. And that's my argument here is that I think because he only tested part of the sample and I can't believe why he didn't test the rest, but this is totally prejudicial to a defendant. It was totally irrelevant evidence, was it? Pardon? Totally irrelevant evidence. If you're a lawyer, we use legal words sometimes. Yes. Totally irrelevant evidence. Yes. And when the expert testified, even to examining one little guy, he says, well, we got a match at this. We got a match at three. We got a match at four. We got a match at five. And when the jury hears the word match, they think he's got to be the guy. Exactly. We got to convict because it's a match. That's right, that's right. Because they're not educated into DNA. That's right, and DNA is the most powerful of all evidences for persuading a jury. Let's see, did you come in on a motion of limine and say that the expert shouldn't testify and use the word match because the word match is prejudicial, did you do that? The defense below did not. They argued that this was inadmissible on foundational grounds. What do you think the likelihood of such a motion being granted? Unlikely. I'd like to then. We're not going to exclude certain words in the course of a trial. We're not going to say you can't use that word, you can't use this word. That's... This was the argument made below that this was inadmissible, and so that's what I've raised on appeal. But the trial, regarding admissibility. Yes, right. Regarding admissibility, that is a matter for the trial judge to decide, and the standard of review is? In this case, it's de novo, because this is a question of foundational adequacy. Let's just stick with just general relevance. What would the standard of review be for that? It would be an abuse of discretion. And my last issue I'd like to get to has to do with striking the testimony of Mr. Johnson regarding probabilities. Here, clearly, the defense made a motion below that the testimony should have been stricken. Well, let me ask you this. Once we get, once the trial judge ruled that the DNA testimony was admissible, the probability went hand in hand with his earlier testimony, didn't it? I would disagree, because here- You think the trial judge could have allowed him to testify, and then could have- Stricken the testimony regarding probabilities. That's correct. Aren't almost every DNA case, don't the experts always sort of put it in context? And that context is, how likely is the match? One would hope so, Your Honor, but in this case, unfortunately, the DNA expert was an expert in forensic biology and DNA analysis, but had absolutely no idea about probabilities and mathematics and statistics. And so he testified that I simply put in the numbers- So the rule is, according to you, that they had to bring in another expert to analyze that very same evidence that the first expert analyzed and came to a conclusion upon before, and only that second expert could testify as the probability. No, that's not correct. If Mr. Johnson had been competent to testify, he clearly should have testified here, but he was not. And your argument is that because he used the computer program to- Not because he used the computer program, because he was unable to explain what the numbers meant. And of course, the Illinois Supreme Court Miller said that once you have DNA evidence, you have to have statistical analysis to make sense to the jury, because otherwise it skews it greatly prejudicially in favor of the prosecution. And the case of Dyback v. Weber said, just because you have an expert in one area doesn't mean he's necessarily an expert in another. And here he was asked very simply by the defense attorney, could you tell us what the pool is of people? Could you tell us how many people, how many blacks in this area would match at four loci? And he could not compute anything and he could not give any answers. What did he say? Didn't he say something like one in seven? He said one in 71 blacks cannot be excluded from having contributed to the mixture of the DNI profile. Do you think that was sort of over the head of the jury? I think the prosecution used it very effectively and that's why he had to- Isn't that what they should do? They should- They should use everything very effectively, just like defense counsel should be very effective on the other side. And he should be when he has an expert who he can actually cross-examine, which Mr. Johnson was not competent to do. And that's why his testimony should have been stricken. The prosecution did say in closing argument that Mr. Mitchell would be on a side of only 10 people out of 710. And the other individual, the co-defendant, who did not match would be on the other side. And they said, statistics don't lie. They said the database doesn't lie. This is what they told the jury. Well, the fact is statistics do lie when they are not explained. And a defense has the right to cross-examine an expert. Isn't that almost the generally understood knowledge that people can manipulate statistics in any way they want? And most people accept that. Well, we don't accept that in the courts. Well, but don't forget, argument is one thing, evidence is another. Yes, but having the ability to cross-examine someone who is required to testify about statistical analysis is a mandate. And here, Mr. Johnson was incapable of doing that. And I think this brings up the recent case of people versus Harvey Wright, which I understand was just reheard. But the fact is, it has to do with the Arizona study that the defense attempted to cross-examine Mr. Johnson on. He, again, was totally incapable of talking about it. And this is critical to understanding these figures. Because obviously, the FBI said using the product rule, at nine loci, there would be a one in 113 billion chance of two people matching. And of course, when we look at the Arizona and the more recent Illinois and Maryland studies, we see that there were numerous pairs of people who matched. Wasn't that brought out to the jury? And wasn't he asked about that very early? He wasn't able to answer that. No, but wasn't he brought out, wasn't it brought out before him that there was an Arizona case where two individuals came out as a match at a certain loci? And he wasn't able to answer it or give any analysis to it? No, but it came before the jury that it can happen, that mismatches can occur. Well, in one question, yes, but there is no explanation. And what I'm saying, this is critical because it leads into what we call the prosecutor's fallacy, which is a logical fallacy. And what happens in that, just like here, they allege that the defendant would be in a very small proportion of the population that would match this, though he was not deliberately matched, but they said he could not be excluded. But what they do not go into is the number of people that could match. And this was a case at four loci. There could have been hundreds of thousands of people who could have matched. And so they let the jury believe that Mr. Mitchell was probably the one that was guilty when, in fact, when you see all the people that could have matched, it was very unlikely that he would be guilty and probably that he was innocent. Let me just bring out- That's a logical fallacy. There is something to that, but the other problem is that you have to put everything in context. And context is that the gloves were found in the barn controlled by the vice lords. And Mr. Mitchell was the vice lord. And Mr. Mitchell admitted in his testimony that he was in that very barn. But the context is- So you can't say that there are 100,000 other, a million other, or a billion other people that could have left that very DNA when that DNA was found in the barn where the vice lords hung out. But, Your Honor, this is what the prosecution argued to the jury. The defense has a right to cross-examine on those figures because we don't know how many people were in the barn, but that doesn't really matter. The figures that were made is what, of a random population, how would Mr. Mitchell match up with this particular DNA for loci? Context makes a difference. Well, it does make a difference, but this is the most persuasive evidence to a jury. And the fact that this was a mixed sample of DNA with at least three different individuals on it. Mr. Becker, we've taken a lot of your time. We're gonna give you some time for rebuttal. Thank you very much, Your Honor. Thank you. Good morning, Your Honor. May I please the court? My name is Assistant State's Attorney, Amy Wittropa Kern. Before you start, I have a couple of questions. I'm sorry, the last name again? Kern, Your Honor, and I, it's K-E-R-N, and I'll address the fingerprint issues and the DNA issues with this court's permission and then defer to my partner, A.S.A. Ferencrogg, to address the issue regarding the statement and the impeachment. You mean one's gonna do fingerprints  Yes, if that's all right, Your Honor. Is this going to be a long statement? Yes, this court's allowed. Okay, and you're gonna do the fingerprints? The fingerprints and the DNA. Okay, and the DNA. All right, let me ask you this. What is a ACEV test? An ACEV test is an acronym that's just used, it's a name that was given to the methodology that's been used for over 100 years in examining fingerprints. Right, and is it not the standard technique for fingerprint analysis according to the FBI? As far as I know, yes. I would point out that that wasn't brought out in the trial court. There was a question about it that was sustained, but I think it is discussed in one case, the defendant cites in his brief out of Maryland. When you say it wasn't brought out, was it not brought out in the course of the motion in Lemonade? And we're not talking about a question, we're talking about the discussions counsel and the judge had outside the presence of the jury to see whether or not this individual should be allowed or allowed to continue to testify. That's correct. Let me ask you this, in the ACEV, do you know what those letters stand for? I do, it is... It means analysis, comparison, evaluation, and verification. Correct. And do you know how long that standard method for fingerprint analysis has been in existence? Over 100 years, it's an acronym that was... 1950. And the acronym was coined, I believe, as around 1995, but it just describes... Okay, and should every person who is accepted as a fingerprint expert at least know what that test is? That's a question, I think, for the trial court, if it had been raised below. If there was an issue with regarding this expert... Do you think an expert should at least know this test that's been in existence for 100 years, used by the FBI, used by people throughout the world? This expert was not familiar with the acronym. This expert testified to what she did. Okay, and does a method used by an expert have to be generally accepted in the scientific community? To satisfy the FRI standard? Yes. And fingerprint identification and the methodology of fingerprint identification... And did this person tell us what their method was to make these determinations? If, did this witness? Absolutely. She described her methodology in detail. She explained, not only for when she lifted a print with respect to the ammunition box, and then when she did the comparison of both the fingerprint from the ammunition box and the paintbrush. No, she told what she did, but did she explain where she learned how to do this? What method it is? What book it came from? What program it came from? She, well, she explained that she had training from Illinois State Police. She explained her qualifications, and she explained the procedure used and that it's the standard practice to use this procedure, which she did. Right, but she never told us it's the general, it's a generally accepted process that she... She did, I believe, on Redirect, is the one page I could point to specifically. She refers a hundred... Well, I couldn't find it. You couldn't find it. And to the extent that she was asked questions, was she asked those questions, and was she precluded from answering, or was she unable to answer them? Well, let's go with the first one. Was she asked questions that she was unable to answer? Other than the... No, she wasn't. She was able to answer all the questions. And I think it's important to note, as Justice Garcia pointed out earlier, that it's important to distinguish between a FRI challenge and a challenge to a particular expert. FRI deals with the scientific methodology, and that is not, as Defense Counsel just admitted here, that is not what was ever challenged in this case. He's always challenged the specific expert, and that's what he's doing here. And that, the crucible for testing a particular expert's testimony, the qualifications, the basis of their opinion, is cross-examination. Well, let me ask you about this particular expert, nonetheless. Here she was, a fingerprint expert, only between 95 and 2000. The trial occurred in 2008. She herself testified that there was a more experienced fingerprint expert that reviewed her work. And so the question becomes, why did the state elect to call her as the witness, as opposed to the individual that was more experienced and presumably remained in the fingerprint expert field when the retrial occurred in 2008? Because she had left that field eight years earlier. Why should the courts allow the representatives of the people of the state of Illinois to pick the lowest qualified expert who you wonder whether she could now qualify given her departure from the field? You know, why should we allow past acts, past deeds or past qualifications serve to qualify that expert as opposed to current qualifications? In the first instance, I would disagree that she's not qualified. She did the comparison and she was qualified to do that. The comparison could have been done by anyone at any time. It could have been redone in 2008. It could have been redone in 2007. It isn't DNA evidence that can decompose and be unavailable for future testing. Fingerprint evidence exists and it's going to continue to exist and it's available for anyone to examine. Isn't that a fair statement? As far as I know, I mean, she did testify that she preserved the prints. They were admitted at trial. She photographed them. But I don't think there's anything either generally or in this record where this court should read that there was anything improper about it. Either she's qualified as a fingerprint expert and she made a comparison in accordance with reliable scientific methodology or she didn't and I think it's very clear that she did. And I think that's a good way to point out that this case is markedly different than Safford. This is not a Safford case. Both when you compare the testimony of the two experts from Safford and here and then also when you look at the evidence as a whole which would go to the harmless argument. I mean, this was a case where there was overwhelming evidence in addition to the fingerprint and the DNA. What role did the fingerprints really take? Circumstantial evidence. I mean, as fingerprints usually are. Didn't you have direct evidence of virtually the same thing? Direct evidence that he was the shooter and that... No, direct evidence that he was in the barn which is all the fingerprint evidence really established. Sure, well, yes, sure we did. But, you know, it's additional evidence. It's one, it's an additional brick in the wall. He testified that he was in that barn. Yes, but it's an additional brick in the wall of the state's evidence. It's relevant evidence and it tends to support the state's theory. It tends to make any issue of in contest more or less probable. And isn't there sort of a standard rule in prosecution practice that placing the defendant in the location is almost all you really need? So to the extent that he testified that he was in the barn, the fingerprint evidence was at most cumulative? Well, I don't think, I don't know if I'd say there's a general rule and also I'd point out... You've got to place the defendant there. Well, of course, sure. I mean, it's again, it's circumstantial evidence. That's what finger, not until he testified though. But that is, I mean, fingerprints are generally always circumstantial evidence. In its totality. Correct. Yes, and from, for the harmless perspective, the harmless argument at issue with the fingerprint evidence, absolutely. I mean, this evidence was overwhelming even apart from the fingerprints and the DNA. So I, it's clear this is not a Safford issue. It's clear that this is also not a Frye issue. What about the DNA statistical qualifications of the expert? Is there such a requirement? Is there a requirement that he be a statistician? Yeah. No, DNA analysis and his qualification as an expert and DNA analysis without objection. What about the ability to explain the numbers he puts before the jury? Seems to me that that should be a basic sort of requirement. He did explain them. He explained the frequency generated in this case, the rarity that one in 71 blacks, one in 71 white, and one in 82 male Hispanics, excuse me, Hispanics could not be excluded. But the questions I think I'd like to point out, the questions that counsel's relying on and that trial counsel posed regarding, regarding calculating the frequency, how many times people would match it for loci, is a completely different question. Every time he was answered a question about the statistics in this case, he answered it. So there's, it's really not true that there was, he was unable to explain the statistics in this case. He was, there were some irrelevant questions thrown at him regarding things like the Arizona study and calculating things with a calculator that had absolutely nothing to do with the generation of the rarity of this profile. It's not a match, so it cannot be excluded. But generating this particular statistic. Well, what was the idea of even putting on a DNA expert here when you didn't have a match of identification? Just to ad bar things, to confuse the jury? Is that what that was? No, it's relevant evidence. It's a mixture that was recovered from the glove. And it's, I think it's also to take important to, when you're looking at the relevance, not only to take into account the fact that he cannot be excluded from it, but also the fact that the co-defendant could. So you take that all together, it's certainly relevant. You know, defendant is basically suggesting that it cannot be excluded, could never possibly be relevant in a DNA case. And that's simply not true. Defendant is also mistakenly suggesting that the state could have tested an additional four loci. And that is simply incorrect. And that is not borne out by the record at all. It's just, it's scientifically incorrect. Was that exact question put to the DNA expert so that we could have clear evidence on the record? No, he was never asked, why didn't you test it for? He was asked specifically, you did not test at this location. You did not test at this, you did not test at this. But he did testify clearly that the science of DNA evidence and his ability to process evidence is limited by the amount of DNA on the, on the recover from the item and how during the amplification process he copies it. Gordon's question, why DNA evidence came in to begin with? And you answered that it was circumstantial evidence, weak as it may have been. There's also been references made to the so-called CSI effect on juries. And did that sort of play a role in trying to get DNA evidence before the jury because they may be questioning whether, if DNA wasn't admitted? I would have to say no. I mean, that's not clear from this record. I'd also like to point out what is clear from this record is this was evidence DNA testing that defendant wanted done. This was done at the behest of the defense and on retrial. And so it- So it wasn't introduced at the first trial? It was not. It was not tested until after the first trial. It was not tested until 2007. And that was, it's very clear if this court looks to the pretrial dates, the dates preceding the second trial, that it would, dates were continually being taken because of this testing that the defense wanted. And so the Illinois State Police tested it and the results were what they were. I see, you know, the state that uses DNA evidence as circumstantial evidence is what you're saying. No, I'm saying fingerprint evidence is generally circumstantial depending on any case. No, no, I'm talking about DNA evidence. DNA, it would depend on the results and where it's found and things of that nature. I mean- Why was it there to begin with, DNA evidence? The DNA evidence was there to begin with because defendant asked for it. And then when the results came in, it was circumstantial evidence that he had worn the gloves that were found in the barn and he could not be excluded from the mixture. I guess- He couldn't be excluded. So when a jury hears he couldn't be excluded, that means they must convict. No, that's not what that means at all. It doesn't, the average person, what do they know about DNA? They know what's put before them by the state's expert and what's addressed on cross-examination and argued by the parties. Was the state expert a certified DNA expert? Yes, he was. He worked for Illinois State Police. He was qualified and accepted without objection. I just asked whether he was certified. What do you mean by certified? They certify DNA experts, like I'm a certified DNA expert. I spent six years to get there. I mean, based on his testimony regarding his credentials and his employment. Yeah, I mean, I couldn't find it. I don't think there's a specific question using the word certified. It was stipulated that he was qualified as an expert, wasn't it? I don't know if it was, I think you're talking about Lynette Wilson. I don't know if it, he was presented at that trial as a witness. He was non-qualified. Exactly, I don't recall if there's, exactly, yes. If there are no other questions with regard to the fingerprints and the DNA, I'll defer to my colleague. Thank you. Okay, so you're the fingerprint guy. No. I mean, the infusion. Yes, your honors. Let me ask you a question. Oh, let's get her name first. I'm Heather Farnkrog. I'm sorry? Heather Farnkrog. Last name, Farnk? F as in Frank, A-H-R-E-N-K-R-O-G. Got really good at spelling that. This is what I'm wondering. Yes. I just have a series of little questions. You're familiar with Rule 806 of the Illinois Rules of Evidence that took effect in January, are you? I believe so, your honor. Okay, well, you know, I just want to read you what that rule says. It says, when a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked, may be supported by any evidence, any evidence which would be admissible for those purposes if the declarant had testified as a witness. Now, do you agree if that rule was in effect at the time of this trial, the trial judge should have admitted the prior inconsistent statements? No, I do not, because the cross-examination of Demetrius Jones specifically included every single question the defense counsel wanted in at the second trial. It was already there. All of the previous statements made by Demetrius Jones, he was cross-examined on that within that transcript. There was nothing extra. There was no other impeaching evidence. Well, you heard counsel for the defendant talk about certain evidence. Is he mistaken? Yes, yes he is, yes. If you read the transcript of Demetrius Jones' testimony at the first trial, that the defense counsel specifically cross-examines him on every single point he raises in his brief. You will concede that while some of the information may overlap, that the questions defense counsel at the second trial sought to introduce were a little different than the questions put to him in the first trial. The defense counsel at the second trial may have wanted to go further with it, may have asked those questions differently, and the trial court said that you don't get to do that. And the trial court did ask defense counsel, how do you plan to do this? How do you plan to put questions to a non-present witness? He only left it at questions. I guess the real question is, how do you get an answer, and does your research, or did your research, turn up a single instance where a court has ever allowed additional questions to be put to a witness that isn't present in court? No, Your Honor. I mean, it just doesn't seem like it's feasible, and our court systems, to some extent, have to be practical, and the practicality is that you can't do it. It would have been unfeasible, and beyond that, it would have then become very prejudicial to the state's case, because there would have been no redirect. There would have been no way to answer any of those questions that may have come up with additional cross-examination of a witness that was unavailable. The bottom line is the confrontation clause was not, there was no issue of a confrontation issue here. Before we get into there, defense counsel sought at the trial to call the police officers who interviewed Jones, or to introduce his grand jury testimony, and prior written inconsistent statements. I mean, isn't that the type of evidence that's normally used in a trial for impeachment purposes? It is, Your Honor. And it wasn't used in the first trial. It was used in the first trial. The same questions, the same type, the same questions that he wanted to ask at the second trial were asked and answered by Demetrius Jones at the first trial. There is nothing that wasn't covered in that transcript from the first trial. He may have wanted to ask the questions differently. Maybe if he had been the counsel at the first trial, he would have asked more questions, but that's not the issue here. It was an abuse of discretion standard. The trial court was within its discretion by denying the defense motion. And beyond that, as the trial court pointed out, none of these questions even went, none of these questions would have, all of these questions were covered in the first trial. What I pointed out in my brief was that none of these questions even served to impeach Demetrius Jones. His testimony regarding him seeing the shooter, none of that was pulled into question by these previous statements. They all involve time increments and a little bit more detail that he gave when he identified defendant in a lineup. So none of these issues the defense counsel wanted to bring out again would have done anything to impeach Demetrius Jones, very solid identification of the shooter. And in that regard, I will very briefly address the cumulative error argument. There is simply overwhelming evidence here. If the jury had not received, not seen the scientific evidence or the physical evidence of fingerprint, none of that would have changed the result. There was no reasonable probability that a jury would have acquitted the defendant based on the overwhelming evidence here. Eyewitness testimony of Demetrius Jones, eyewitness testimony of Kevin Johnson, supported by Marie Coffey, supported by Mary Lewis, supported by the identification of the rifle and the bullet that killed Paulette Peek found next to her body. In conclusion, your honors, the defendant was entitled to a fair trial, not a perfect trial, and that's exactly what he received here. The evidence is overwhelming. It proved that defendant fired his nine millimeter rifle killing an eight year old child. We respectfully ask this court to affirm his conviction and sentence. Thank you. What do you have to say about her argument where she says that everything that, everything was done in the first trial for impeachment? And there's no question that you could show that it wasn't already done in the first trial. It's inaccurate, your honor. Well, I mean, show me how it's inaccurate. I can point to one specific situation right off the bat is that we're at the trial, the first trial Mr. Jones talked about that he denied pushing his mother into the alley, which of course would have affected his sight of the shooter but what he actually gave the statement to the police was he gave an affirmative statement that he in fact pushed his mother. That makes a huge difference to a jury where you just get up and you're asked a question, you deny that this happened. And a matter of fact, you've made an affirmative statement. So this is something what clearly would, was definitely an impeachment. And clearly that wasn't in the first trial. Correct, correct. Is there anything else besides that? That's the major point I think that really hits the impeachment because it goes to his ability to see the shooter. And then I would also like to briefly address the harmless error argument which was made and that's in connection with cumulative error here. The cumulative errors in this case, I think were extremely prejudicial and require a new trial. Let's, let me ask you this. Yes. You have six or seven cumulative errors? Yes. How many can we subtract and still get to where you wanna go that is reversible error? I think we have- Can we subtract four? Can we subtract three? Can we subtract one? Can we say that the scientific evidence was properly admitted, but the impeachment was error and still gets reversible error? I think you have to see that all of these are error. I mean- Well, but what if we don't? My point, that's my question. But if you can't- Well, it's hard to speculate what your honors are going to do. But what I'm saying is the, clearly the forensic- It may be speculation on our part at this point. It might be your honors. But what I'm saying is the forensic evidence clearly in and of itself has four different issues that I've raised with respect to forensic evidence. And the issue regarding impeachment is significant because that was the state's star witness. Contrary to what the prosecutor here are saying, the evidence here was not overwhelming. If you take away the fingerprint evidence by which they attempt to link Mr. Mitchell to the gun in the inoperable car and clearly try the DNA evidence to link him to the shooter, because if you recall, he did not test positive for the gunshot residue test. So that's why they so emphasize the gloves, even though there was a mixture of DNA. So you take those two away and all you have is a testimony of Kevin Johnson, who I give no credit to his testimony because he, of course, got a sweet deal- We don't know whether the jury took your position in that regarding Mr. Johnson, right? We don't, but you have to look at the evidence as a whole. And here, he clearly- And oftentimes happens that there are cases that are built in proof beyond a reasonable doubt with only, only equally culpable, maybe not equally, certainly co-defendants. But the jury may have given no credibility to Mr. Johnson whatsoever, since he not only got one deal from the state, but then when that didn't work out, they made another deal to make sure that he could even have less time. And all this was to essentially buy his testimony. All that was pointed out before the jury. It was, it was, that's correct. And then you have Demetrius Jones who fled the second trial and wasn't present. Well, I meant to ask because it's certainly confusing whether Mr. Jones is or is not, or was or was not a military man at the time of the second trial, or at the time of the first trial, at any point. I believe he was- I thought you denied, or defense counsel below, denied that he was in boot camp at the Navy station in up north. Didn't he deny it? He might have, Your Honor. He said it was a falsehood. Yes, I believe so. But clearly at the time of the second trial, he was apparently not in the military and he had fled the jurisdiction. And this goes to our point about the lack of ability to impeach him. Clearly the prosecution had the right to put on his testimony, though that was awkward. There was a lot of talk about that. But clearly if the prosecution can do it, so can the defense. They should have been allowed to put on that evidence impeaching him. How does that work again? Well, I would assume, just like the prosecutor brought in a law clerk to pretend to be missing- You can read a transcript. Right. You don't provide a transcript that could be read regarding any answers to those additional questions that you sought to put to that missing witness. Well, I assume they would have to redact certain portions and do that with the police witnesses. You hear the word offer of proof? Yes, precisely. Yes. That wasn't done, was it? No. You can't make an offer of proof to a jury. But you can make it to the judge. To the judge, that's right. And clearly the question is, how do we get this information before the jury? Let's say we agree with you and we send it down for another trial. How would you do it in a practical way? I mean, practically speaking, how would you do it? You would either have a witness, just like the prosecution did, or you would pretend to be the person. We can get the witness part. Right. Okay. Right. You ask questions, what happens next? Right, and then someone would give the answers that he gave. How can you get an answer? You have someone give the answer that he gave at the time. That that person believed? Well, but you say the questions weren't asked before. So how can you get the answer to a question that was never asked? For example, in the police report, that was information that was there that he had given an affirmative statement about. The police have, what if- So you could testify to it. Sure, no, certainly. What if he says, what if Mr. Jones would have said, I never said such a thing? Mr. Jones isn't there, and that's why the defense gets a right to bring in this testimony, because he's unavailable. That's the very reason. Well, the question is how practical can it be to go only one way, to ask additional questions without getting any answers, because the witness isn't there. Your Honor- See, that's in Rule 806. Yes. It codified what Illinois law was. Illinois law says that a lawyer at cross-examination has a right to put in any, the word any, evidence. If the prosecution- Well, then hold on, hold on. Did defense counsel have the right to introduce any evidence at that first trial? Yes, sir. Okay, and you're saying that that rule that Justice Gordon just read should be expanded so that in a second trial, when that witness is not available, now I'm not even sure that that rule addresses the unavailable witness situation or scenario. Of course it does. Of course, of course it does. The reason that- Does it tell us how it gets done? I don't believe it tells us how it gets done. That's up to the trial judge. What I'm saying is- The trial judge had difficulty in understanding how- The trial judge did have difficulty here. What I'm saying is- I'm having difficulty. Yes, but it's a violation of due process that the prosecution could put in evidence- Do you have a case? Pardon me? Do you have any kind of case? Are you saying this is the first time it's ever happened? No, I quoted, I believe the Smith case in my brief, which says exactly, you have a right to do this. If a person is unavailable, the defense has every right in the world to put in any evidence that they can that impeaches his testimony. That's always what the law's been there. Was the Smith case a retrial case, or was it a case of the first time that they were trying to introduce that evidence? I don't recall, but I remember it had to do with the witness who had died, and the unavailability exception clearly applied in that case. So what I'm saying here is- You don't recall reading in that Smith case that testimony was introduced from a prior trial where this now-deceased witness had testified? Yes, I believe that's what happened. I can't recall for sure, but I know that unavailability exception came through- I think we've covered everything, but go ahead and wrap it up. Okay, very good. Well, Your Honors, in conclusion, I think here Mr. Mitchell is clearly entitled to a new trial based upon these cumulative errors. I think this case was a forensic farce, and I think this court cannot countenance what happened in this case. And thank you very much for all your time and attention. Thank you, Mr. Becker. All right, the case will be taken under advisement.